819 P.2d 1016

**Richard WYCKOFF, Petitioner,**

**v.**

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Mitchell Electric, Respondent Employer,**

**Fremont Indemnity Company, Respondent Carrier.**

**No. 1 CA–IC 90–107.**

Court of Appeals of Arizona, Division 1, Department E.

Sept. 12, 1991.

Taylor & Schaar by Don F. Schaar, Phoenix, for petitioner.

Anita R. Valainis, Chief Counsel, Indus. Com'n of Ariz., Phoenix, for respondent.

Jones, Skelton & Hochuli by Terrence Kurth, Phoenix, for respondents Employer and Carrier.

OPINION

CLABORNE, Presiding Judge.

This is a special action review of an Arizona Industrial Commission award terminating temporary benefits with a 20% scheduled disability compensated at 75% of the average monthly wage and denying reopening of the claim. Because the disability classification should have been unscheduled and insufficient evidence supported denial of reopening, we set aside the award.

## I. FACTUAL AND PROCEDURAL HISTORY

In 1977, after serving some twenty-two years in the United States Marine Corps, petitioner employee (claimant) was involuntarily discharged because of a 10% military disability because of asthma. He then was forty-one years old. After the discharge, claimant never was refused civilian employment because of the asthma, but he voluntarily quit one job constructing boats in 1978 because of intolerance to fiberglass dust.

In 1984, while working as an electrician, claimant injured his left knee. Respondent carrier (Fremont) accepted compensability. Claimant was then earning $8.00 an hour and about $1,385.00 a month. His average monthly wage was established at the statu-

tory maximum ($1,325.00). *See* A.R.S. § 23–1041.

Treatment for this injury included four left knee surgeries. In March 1987, the treating physician, Dr. Edward Campbell, Jr., an orthopedic surgeon, reported that the left knee was stationary with a 20% permanent impairment. Fremont then terminated temporary benefits with the recommended impairment and a scheduled disability. Claimant protested, asserting, among other things, that the disability should be unscheduled.

Hearings ensued. Claimant testified that he intended to remain in the Marine Corps, but that his asthma disability cut short his career. Claimant sought to testify about his pay rate in the service, but the Administrative Law Judge (A.L.J.) excluded this testimony. He also excluded testimony about claimant's general reaction to dust.

The A.L.J. issued an award for a 20% scheduled disability. On appellate review, this court set aside the award. *See Wyckoff v. Industrial Comm'n*, 1 CA–IC 88–130 (App. April 20, 1989) (memorandum decision). Because Fremont did not argue that a disability for military service is legally insufficient to establish an earning capacity disability, the court did not address this issue. Rather, the court concluded that the A.L.J. had misevaluated the factual sufficiency of the evidence:

> If any actual or potential effect on employability constitutes an earning capacity disability, the evidence that the asthma disabled claimant from military service and the boat-making job obviously satisfies this standard. If, however, the standard is one of fact, the administrative law judge erred by excluding evidence relevant to this factual determination. Claimant was not permitted to testify concerning how dust affects his asthma. Without this evidence, the administrative law judge could not accurately assess the potential effects of the asthma on claimant's earning capacity.

*Id.*, slip op. at 14 (citation and footnotes omitted).

Pending a *de novo* hearing on permanent disability, claimant filed a petition to reopen the claim. Fremont denied reopening, and claimant protested this denial. The permanent disability and reopening issues were then consolidated for hearing.

At the hearings, claimant, a labor consultant, and two medical experts testified. Claimant reiterated that his asthma ended his military career and he received a 10% military disability. Although the asthma was diagnosed some fourteen years before the discharge, it first affected his fitness for Marine Corps service in 1977, solely because he was unable to perform a fitness test which included a three-mile run. This physical fitness standard related to combat readiness.

Regarding his earning capacity, claimant testified that he earned approximately $1,200.00 a month as a gunnery sergeant in 1977 and would have earned some $2,300.00 a month as a gunnery sergeant in 1984. In contrast, his civilian earning capacity had been about $5.00 an hour in 1977 and $8.00 an hour in 1984. He acknowledged that he was earning more when injured than he had ever earned before.

Claimant also testified that he took nonprescription medication for his asthma and that he was sensitive to dust. However, there was no testimony concerning whether dust affected his asthma. After the industrial injury, he could not climb three and one-half hours a day, kneel an hour a day, or stand three and one-half hours a day as required by his date of injury employment. Finally, he testified that since the closure of his claim, his knee symptoms had progressively and substantially worsened.

The labor consultant conceded that claimant's asthma disabled him from serving as a Marine. But he testified that a military disability concerned combat readiness and did not equate to an inability to perform civilian work. He also testified that the Marines have a higher standard than other military services. In his opinion, claimant's 10% military disability did not limit his earning capacity in the "open labor market."

Dr. Campbell agreed that claimant was disabled from the climbing, kneeling, and standing required by his date-of-injury employment. He also testified that the left knee condition had deteriorated since March 1987. Dr. Campbell related this worsened condition to the industrial injury and recommended additional surgery to treat what he described as uncommonly rapid degeneration.

Dr. Gerald Moczynski, a former military doctor, testified that military disability ratings are more stringent than disability ratings under the AMA Guidelines. Regarding claimant's current condition, Doctor Moczynski acknowledged that X-rays revealed osteopenia, but he was not questioned about the cause of this condition. He also diagnosed chrondromalacia, a precursor to arthritis, but he found no evidence of actual osteoarthritis. Dr. Moczynski disagreed that these findings warranted additional surgery or other active care. He again rated a 20% permanent impairment, which included pain, loss of motion, atrophy, and chrondromalacia, but did not include the claimant's ability to work. The A.L.J. then issued the award. First, he rejected claimant's claim for an unscheduled disability. The A.L.J. relied on the labor consultant's testimony that the military disability had not reduced claimant's earning capacity in the open labor market and claimant's testimony that he was earning more when injured than he had ever earned before, to conclude that claimant had failed to prove that his asthma resulted in a loss of earning capacity when the industrial injury occurred.

Second, the A.L.J. awarded a 20% scheduled disability but increased the rate of compensation from 50% to 75% of the average monthly wage. He concluded that although A.R.S. § 23–1044(B)(21) "was not effective until October of 1987 subsequent to the industrial injury involved in this matter, ... it represents a legislative intent to resolve the problem created by ... *Dutra,* and accordingly it is adopted by the undersigned as a resolution of this matter."

Third, the A.L.J. denied reopening. He accepted Dr. Moczynski's testimony and re-

lied on it to conclude that claimant failed to prove "any new, additional or previously undiscovered disability or condition causally related to his industrial accident requiring further medical treatment...."

On administrative review, the A.L.J. affirmed the award without modification. Claimant then brought this special action.

## II. DISCUSSION

■ On review, claimant asserts that his disability should have been unscheduled. He concedes that he had the burden of proving that his asthma was earning capacity disabling when the industrial injury occurred, but he argues that he satisfied this burden with the evidence that the asthma disabled him from continuing his military career and from working as a boat maker.

■ A disability within the schedule is nevertheless compensated according to actual lost earning capacity if it is a successive disability:

In case there is a *previous disability,* ... the percentage of disability for a *subsequent injury* shall be determined by computing the percentage of the *entire disability* and *deducting therefrom* the percentage of the *previous disability as it existed at the time of the subsequent injury.*

A.R.S. § 23–1044(E) (emphasis added). Successive disabilities are unscheduled because their cumulative effect is likely to be greater than the simple total of the disabilities added together. *See Ossic v. Verde Central Mines,* 46 Ariz. 176, 188, 49 P.2d 396, 401 (1935); *see also Hoppin v. Industrial Comm'n,* 143 Ariz. 118, 123, 692 P.2d 297, 302 (App.1984); 2 A. Larson, *Workmen's Compensation Law* § 58.24 (1989).

■ A previous disability need not be either work-related or within the schedule. *See, e.g., Yanez v. Industrial Comm'n,* 21 Ariz.App. 367, 519 P.2d 220 (1974) (military abdominal injury), (*cited with approval* in *Borsh v. Industrial Comm'n,* 127 Ariz. 303, 305, 620 P.2d 218, 220 (1980)). The disability may even be congenital or developmental. *See, e.g., Adams Insulation Co. v. Industrial Comm'n,* 163 Ariz. 555,

559, 789 P.2d 1056, 1060 (1990) (innate low intelligence previous disability under A.R.S. § 23–1044(E)); *Lewis v. Industrial Comm'n*, 126 Ariz. 266, 269, 614 P.2d 347, 350 (App.1980) (degenerative arthritis previous disability under A.R.S. § 23–1044(E)).

Whether a pre-existing condition will operate to convert a subsequent scheduled disability, in this case the claimant's knee condition, to an unscheduled disability depends upon a showing that the pre-existing condition resulted in a loss of earning capacity.

Furthermore, the supreme court has created several presumptions of disability. A pre-existing impairment that is both work-related and within the schedule is *irrebuttably* presumed to be disabling. *See Ronquillo v. Industrial Comm'n*, 107 Ariz. 542, 544, 490 P.2d 423, 425 (1971). A nonindustrial impairment that would have been scheduled if it were work-related is *rebuttably* presumed to be disabling. *Id.* (dictum); *see also Adams Insulation Co.*, 163 Ariz. at 558, 789 P.2d at 1059. Finally, a pre-existing impairment of great magnitude, such as the loss of an arm, a leg, or an eye, is *conclusively* presumed to be disabling. *See Pullins v. Industrial Comm'n*, 132 Ariz. 292, 295, 645 P.2d 807, 810 (1982).

If, however, these presumptions are inapplicable, the claimant must prove that the pre-existing impairment caused an earning capacity disability when the subsequent injury occurred. *See Alsbrooks v. Industrial Comm'n*, 118 Ariz. 480, 578 P.2d 159 (1978). In *Alsbrooks*, the claimant had a 40% military disability from a shrapnel wound to the right knee and a back injury suffered during World War II. The court concluded that a

> physical impairment, the result of a prior non-industrial accident, is [not] a "previous disability" for the purposes of Paragraph E *unless there is some evidence, no matter how slight, that it is also an earning capacity disability.* To hold that after a non-industrial injury, any physical impairment will convert a second scheduled injury into an unscheduled

injury, would, in effect, do completely away with all scheduled injury awards since it is a rare person indeed who does not have some previous physical impairment as a result of some prior injury.

*Id.* at 483, 578 P.2d at 162 (emphasis added). Such an "earning capacity disability," however, "refers to injuries which result in impairment of earning power generally," and the required "effect upon the workman's earning capacity may be minimal." *Id.* at 484, 578 P.2d at 163. The court also concluded that a 40% military disability conclusively established an earning capacity disability. *Id.*

In this case, uncontradicted evidence established that claimant's asthma disabled him from continuing his intended career in the Marine Corps. Fremont did not produce evidence that the normal retirement age of a gunnery sergeant would have compelled claimant's retirement before the industrial injury even if he had not had asthma.

Fremont nevertheless contends that claimant's involuntary military retirement is not a previous disability under A.R.S. § 23–1044(E). It first argues that claimant failed to prove he suffered an actual loss of earnings because of his retirement. We disagree. Claimant produced comparative evidence of his military and civilian earnings. This evidence established an actual reduction in earnings when claimant retired in 1977 and when he suffered the industrial injury in 1984 even if he had maintained the same rank in the Marines. Fremont produced specific evidence concerning the probability of promotion if claimant had remained in the Marines, but it produced no comparable evidence concerning demotion. Although a projection of military earnings that assumed a promotion would be speculative, a projection that assumed claimant remained a gunnery sergeant would not be speculative. We also disagree that *Alsbrooks* and *Borsh* require proof that claimant would have earned more in the Marines than he was earning when injured as an electrician. Earning capacity disability and actual wage loss are not equivalent.

Fremont also argues that a previous disability under the statute is limited to a disability to perform civilian work.

Service in the contemporary military is voluntary. The military advertises to promote enlistment and rewards, with benefits that include wages, to those who volunteer. Military service doubtlessly involves more than this *quid pro quo*, but this consensual exchange is certainly part of the bargain. Furthermore, although military service demands high standards of physical fitness, civilian employments may also demand unusual levels of fitness or skill. Finally, A.R.S. § 23–1044(E) itself does not distinguish military from civilian disabilities. Rather, it refers generally to any "previous disability."

■ We conclude that an impairment that compels the termination of an actual military career constitutes a previous disability under A.R.S. § 23–1044(E).

Claimant therefore is entitled to an unscheduled disability.

■ Because the disability is unscheduled, we need not address the A.L.J.'s adaptation of A.R.S. § 23–1044(B)(21). The denial of reopening, however, is another matter. Regardless of the correct disability classification, claimant may pursue reopening under A.R.S. § 23–1061(H).

The statutory requirements for reopening are a new, additional, or previously undiscovered condition and a causal relationship to the industrial injury. *See* A.R.S. § 23–1061(H). Although active care for an industrial injury is a benefit obtained by reopening, the supreme court has concluded that active care is not a necessary element for reopening:

> Petitioner need not show he is in need of active treatment in order to reopen his claim. He need only show the existence of a new, additional or previously undiscovered condition. The medical benefits available or the appropriate treatment for the new, additional or previously undiscovered condition, as well as any adjustment or modification in the amount of compensation payable, or degree of

disability established, can be appraised after the claim has been reopened.

*Sneed v. Industrial Comm'n*, 124 Ariz. 357, 359, 604 P.2d 621, 623 (1980).

In the present case, both medical experts found bony changes in claimant's injured knee. Dr. Campbell related these changes to the industrial injury. Dr. Moczynski expressed no opinion regarding causation. The only actual conflict concerned whether claimant's current condition required active care. This conflict, however, was immaterial to the right to reopen. Although this court must defer to the A.L.J.'s acceptance of Dr. Moczynski's opinion, *see, e.g., Carousel Snack Bar v. Industrial Comm'n*, 156 Ariz. 43, 46, 749 P.2d 1364, 1367 (1988), this opinion did not support the denial of reopening.

For the foregoing reasons, we set aside the award.

SHELLEY and FIDEL, JJ., concur.